Sarles, Administratrix, Respondent, vs. Chicago, Milwaukee & St. Paul Railway Company, Appellant.

*February 20—March 9, 1909.*

*Railroads: Injury to traveler at highway crossing: Contributory negligence: Duty to look and listen: Unmanageable horses.*

1. Where from the time when a traveler on the highway could first, by looking and listening, have known that a train was approaching a crossing in front of him (sixty-eight feet distant, in this case) his horses were so frightened by the train that they were beyond his control and he was unable to stop them or prevent their continuing in their course and colliding with

the train, he was excused from performance of the usual duty to look and listen and to stop if necessary before attempting to cross the track.

2. To establish that the team was beyond the driver's control in such a case it is enough to show that he was unable, by the use of all reasonable efforts, to control and prevent them, under the impulse of their fright induced by the noise and speed of the train, from proceeding onto the track.

APPEAL from a judgment of the circuit court for Grant county: GEORGE CLEMENTSON, Circuit Judge. *Affirmed.*

This is an action to recover damages for the death of the intestate, alleged to have been due to the negligence of the defendant.

Frank B. Sarles, the decedent, was instantly killed at the crossing of the defendant's railroad with Park street in the city of Boscobel, August 6, 1906. Park street and the railroad make an acute angle. The course of the railroad is from northeast to southwest. Park street runs north and south. Mr. Sarles approached this crossing from the south, driving his team of horses hitched to a lumber wagon without a box. He sat upon the hounds of the wagon. The train approached from the east. At a distance of from 250 to 300 feet from the crossing he was seen by several witnesses. He seemed to have control of his team and nothing unusual was noticed in their actions. When he was about sixty-eight feet distant from the railroad track he had a view up the track toward an approaching train for a distance of 570 feet. The train was approaching at an excessive and unlawful rate of speed.

The plaintiff avers that the team became frightened at the sight and the noise of the swiftly approaching train within this space of sixty-eight feet, just before or just after it had entered upon defendant's right of way, and that the decedent no longer was able to retain control of the team. Plaintiff claims that decedent could not pull back with sufficient force or divert the team to prevent colliding with the engine on account of its unmanageable condition, the high speed of the

train, the difficulty of driving upon the roadway because of its narrowness and the ditches on both sides, and because of the unusual difficulties of the situation thus presented.

The defendant avers that the decedent was guilty of contributory negligence. It is claimed that the evidence clearly shows that the team which the decedent was driving was of a gentle disposition, accustomed to and not frightened at trains, and that the decedent, in his hurry to get home and hitch his team to his carriage in order to go to the depot to meet a relative, negligently omitted to look and listen for the approaching train, failed to stop to let the train pass, and thus carelessly collided with it and was killed.

The evidence of some witnesses, who testified to seeing the accident, was to the effect that the team became "scared" and "frightened" after it had come within sixty-eight feet of the tracks. On cross-examination they described the actions of the team as "jumping up and down," "galloping," "prancing," and "dancing up and down." These witnesses did not state positively that the team was running away or was beyond the control of Mr. Sarles, nor did they state that Mr. Sarles had control of the team and was only hurrying.

Defendant's motions for a nonsuit and for a directed verdict were denied and the jury returned a special verdict as follows:

"(1) Did any want of ordinary care upon the part of Frank B. Sarles contribute to produce the accident that caused his death? A. No.

"(2) Could Frank B. Sarles, at any period of time from the time he was so near the railroad crossing on Park street that by looking and listening he could have known that a train was coming, have stopped his team or turned them from the railroad track? A. No.

"(3) If the court should decide in this case that judgment should go in favor of the plaintiff, what sum should she recover? A. Four thousand two hundred and fifty dollars ($4,250)."

Defendant's motion to change answers in the verdict and for a new trial was denied, and judgment was awarded in favor of the plaintiff. This is an appeal from the judgment on the verdict.

For the appellant there was a brief by *Howe & Gilman* and *Chas. E. Vroman,* and oral argument by *Mr. Vroman.*

For the respondent there was a brief by *W. G. Palmer, J. J. Blaine,* and *Lowry & Carthew,* and oral argument by *Mr. H. E. Carthew* and *Mr. Blaine.*

SIEBECKER, J. The evidence on the question of decedent's care in driving his team and approaching the railroad track presents a conflict and is susceptible of sustaining different inferences. According to some of the evidence the team was in decedent's control at all times up to the point of collision, thus tending to show that he either did not look to observe the approaching train before attempting to cross the track after he was within hearing or seeing distance of it, or that he observed the train and attempted to cross immediately in front of it. In either event he would be guilty of negligence contributing to his death. But, as set out in the statement of facts, there was evidence tending to show that he lost control of his team after he had passed Dr. Armstrong's home, and there was evidence that the horses were then trotting and were under his control. Dr. Armstrong's home is between 250 and 300 feet distant from the railroad crossing. Two witnesses testify that they observed the team when it was approaching the track and was within the space of about 100 feet of it, and that the horses were then jumping and acting as though they were "scared" or "frightened." Deceased appeared to have hold of both lines and was pulling and holding back. The witnesses testify that the horses continued jumping and rearing until the train struck them, and that the horses appeared to have been frightened at the rapidly approaching train. The train was obscured from decedent's view until he

reached a point sixty-eight feet distant from the track, when he could look up the track a distance of 570 feet. The traveled portion of the approach to the track was narrow, with a ditch on each side several feet deep. From these facts and circumstances the jury were warranted to infer that the horses became frightened at the approaching train when about sixty-eight feet south of the track, that the decedent from that time was unable to retain control of them, and that he could not stop them or divert them from continuing in their course and prevent colliding with the train. Such circumstances present a case where the failure of the driver of a team to look and listen for an approaching train and to stop his team, if necessary for his safety, is excused because the circumstances show that the horses were beyond his control and that he was irresistibly deprived of the opportunity to perform his duty. To establish that the team was beyond decedent's control does not call for a showing that the team was uncontrollable in the sense that they were in a state of frenzy and were running at a very great speed from fright. The team may have been beyond decedent's control in the sense that he was unable, by the use of all reasonable efforts, to control and prevent them, under the impulse of fright induced by the noise and speed of the train, from proceeding onto the track at a time of danger of collision with the train. Such a state of affairs immediately preceding and up to the time of collision constitutes a good and sufficient ground for excusing the driver from the performance of the usual duty to look and listen for the train and to stop, if necessary for his safety, before attempting to cross a railroad track. *Piper v. C., M. & St. P. R. Co.* 77 Wis. 247, 46 N. W. 165; *Guhl v. Whitcomb,* 109 Wis. 69, 85 N. W. 142; *Kujawa v. C., M. & St. P. R. Co.* 135 Wis. 562, 116 N. W. 249. We are of opinion that the trial court ruled properly in submitting this issue upon the evidence.

The contention that the jury's finding in answer to the second question shows that the team was uncontrollable at a

point so remote from the crossing that it could not have been frightened at the approaching train, and hence that the defendant's negligence was not the proximate cause of the injury, cannot be sustained. There was evidence that the horses were not frightened before they arrived at a point about sixty-eight feet distant from the crossing; that the decedent had control of the horses up to this point; that the horses were not frightened or going faster than a trot until they came close to defendant's right of way; and that at this point they became frightened and unmanageable. The credibility and weight of this evidence were for the jury, and if the jury gave it credence the findings negative the claim that the team became frightened and uncontrollable from some cause other than the train.

These considerations call for affirmance of the rulings of the trial court.

*By the Court.*—Judgment affirmed.